## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

```
KEITH J. BERSZTAITIS,         )
                              )
        Plaintiff,            )
                              )
     v.                       )    Case No. 05-1140
                              )
JO ANNE B. BARNHART,          )
COMMISSIONER OF SOCIAL        )
SECURITY ADMINISTRATION,      )
                              )
        Defendant.            )
```

## **O R D E R**

Before the Court are Plaintiff's Motion for Summary Judgment or Remand [Doc. # 13] and Defendant's Motion for Summary Affirmance [Doc. # 16]. For the reasons set forth below, Plaintiff's Motion will be denied and Defendant's Motion will be granted.

### **I.   Background**

Plaintiff filed for Social Security Disability Insurance on June 28, 2002, alleging a disability onset date of August 31, 2001 due to limitations resulting from a leg injury.  (R. at 65-67, 80.) He was 42 years old on the date he filed his application.  (R. at 65.)

After his application was denied at the state agency level, and his request for reconsideration was denied, Plaintiff requested a hearing before an administrative law judge ("ALJ").  (R. at 27-39.)  A hearing was held on October 8, 2004, at which Plaintiff (appearing pro se), his mother, his brother, a friend and a vocational expert ("VE") testified.  (R. at 306-51.)  In a January 5, 2005, decision, the ALJ found that Plaintiff could perform a

significant number of jobs despite the limitations caused by his impairments, and that he was therefore not disabled and not entitled to benefits. (R. at 18-25.) On March 18, 2005, the Social Security Appeals Council denied Plaintiff's request for review. (R. at 7.) Plaintiff then filed the instant complaint for judicial review of the Social Security Administration's ("SSA's") decision.

The record reveals the following about Plaintiff's impairments. When Plaintiff was 12 years old he had a brain tumor which was surgically removed. (R. at 195.) He was on maintenance medications for a seizure disorder thereafter with satisfactory neurologic health. (R. at 195-96.)

Medical records from St. Margaret's Hospital show that Plaintiff was injured in a car accident in February 1994. (R. at 143-145.) He sustained a "high energy comminuted subtrochanteric fracture of the right hip," facial lacerations, a broken nose, and a rib fracture. (R. at 145-55.) He underwent surgery to repair the fractured femur and repairs to his facial lacerations. (R. at 146-48.) After his surgery, Plaintiff attended physical therapy and was admitted to a skilled nursing facility; he was discharged from the facility on March 11, 1994. (R. at 154-56.)

In July 1994, Dr. Kelley released Plaintiff to return to light duty work, four hours per day, with a 15 pound lifting restriction. (R. at 173.) Dr. Kelley advanced the weight restriction to 25-30 pounds in August 1994. (R. at 172.) Dr. Kelley further advanced Plaintiff's restrictions in September 1994, releasing him to work an eight hour day with a 30 to 40 pound weight restriction. (R. at

169.) The weight restriction was advanced to 60 pounds in November 1994. (R. at 167.) In June 1995, Dr. Kelley noted that Plaintiff was at about a 65 percent functional level of the right hip and would probably stay that way. (R. at 164.) In December 1995, Dr. Kelley indicated that Plaintiff was working but got quite tired by the end of an eight hour day. Again noting that Plaintiff had only about 65% functional use of his right leg, Dr. Kelley recommended that Plaintiff work no overtime, lift no more than 60 pounds, and not climb higher than five feet. (R. at 162.)

In September 2001, Dr. Raymond Shields diagnosed Plaintiff with bilateral lower extremity erythema nodosum of indeterminate etiology after Plaintiff complained of lower extremity swelling and painful nodules. (R. at 178-80.) In April 2002, Plaintiff was seen by Dr. Tamara Lauder for stiffness and a jerky sensation of his right lower extremity. (R. at 193.) Neurologist Joseph Matsumoto, M.D., concluded that this was "a voluntary or involuntary guarding response" and he did not see anything serious or worrisome about the spasms, but concluded that the spasms would likely be a chronic problem. (R. at 192.)

On September 24, 2004, Dr. Kelley wrote a letter in which he indicated that Plaintiff had about 65 percent functional use of his right lower extremity, with a limp and poor hip function. Dr. Kelley noted that Plaintiff was placed on permanent restrictions, which were still in effect, including no overtime, no lifting greater than 60 pounds and no climbing over 5 feet." (R. at 238.) Dr. Bailey wrote a letter in which he opined that Plaintiff could work no more than 40 hours per week, with no lifting more than 50

pounds, no working outside due to sun poisoning, and no standing more than five hours. He further opined that Plaintiff could "only sit short periods because he complains of his leg stiffening and the blood flow seems to take a period of time before he can try to walk again." (R. at 237.)

Plaintiff completed an activities of daily living questionnaire on July 08, 2002. (R. at 93-95.) He noted that he had problems tying shoes on his right foot, difficulty carrying objects unless he kept his "right leg locked," constant pain in his right leg, and no relief from pain medication. (R. at 93.) He had been given other positions at his prior employer shortly after therapy, but his production was one-third of his pre-injury production level. (R. at 93.) He also had problems getting in and out of a car, getting out of the bathtub, rising from chairs (due to blood flow problems), problems steadying his right leg, going up stairs could only be accomplished by raising the left foot, then bringing the right foot up to the same step, one step at a time. He reported that he used furniture, walls, counters, and other nearby structures to help balance himself while walking. While he is able to sit for at least two hours, he has to wait before trying to walk because of a cut-off in the circulation to his right leg. He was able to prepare meals, shop, etc, "as long as its [only] around 3 to 4 hours, but after [he] usually need[s] to rest the leg." (R. at 94.) He started every day out slow because his right leg was stiff and sore each morning. He performed yard work and washed his car, but it took forty-five minutes to mow his yard, when before the accident it used to take him twenty minutes. Upon

completing chores his left leg was sore because "the left leg is [his] power leg." His upper body was also sore because it was used to hold him up. He could not perform many activities he used to perform, including tennis, baseball, climbing, biking, and running or jogging. (R. at 95.) On another (undated) disability form, he stated that he had problems getting into floor-level drawers, writing, and an extremely reduced ability to complete tasks (for instance, washing his car takes hours, and requires breaks). (R. at 140.)

Plaintiff submitted letters from prior managers and supervisors, all stating that he failed to perform at an adequate level after his injuries. (R. at 125, 126, 127, 128.) He also submitted portions of depositions from his treating physicians which outline his physical problems. This testimony describes Plaintiff's injuries from the car accident. (R. at 130-138.) The doctor stated that he was limping as of his last appointment in October 1995. (R. at 135-136.) The deposition of Dr. Kelley, dated May 30, 1996, describes his course of treatment and the progression of Plaintiff's right leg. (R. at 240-282.) At the end of his course of treatment, Plaintiff's doctor had assigned him the ability to work no more than 40 hours per week, no lifting more then 60 pounds, and no working at heights greater than five feet. (R. at 268-269.) He also testified that Plaintiff had "permanent disability of his right hip," including a 3/4 inch shortening of his right leg, and muscle weakness. (R. at 278.)

Plaintiff was unrepresented at the administrative hearing. (R. at 307-08.) He testified that he had always lived with his

mother.  (R. at 313.)  They lived in a two-level home, and he could use the stairs with difficulty.  (R. at 313.)  He drove to the hearing, and estimated that he could sit in a vehicle "an hour and 45 minutes roughly" before he needed to take a break.  (R. at 314.) He stated that he last worked July 30, 2001.  (R. 314-15.)  He did "not really" agree with the work restrictions placed on him by Drs. Kelley and Bailey because he would "be struggling even during that time."  (R. at 317.)  Plaintiff reported that he did not have any side effects from his medications.  (R. at 317.)  He had constant pain from the right hip down to just above the right knee.  (R. at 318.)  He also had a coordination problem with the left hand as a result of the brain tumor that was removed in 1972, but he had this problem all his adult life and he was able to work with it.  (R. at 319-20.)  Plaintiff estimated that he could be on his feet about five hours at a time, and then he had to sit.  Walking was about the same as standing, and he walked without a cane or other aid. (R. at  322.)  To bend he had to bend the left leg and keep the right leg straight.  (R. at 323.)  He cared for his personal hygiene, but it was hard.  He cut the grass with a push mower "maybe once in three weeks."  (R. at 324.)  He got breakfast, walked up to the mail, looked through the want ads, did very little cooking, helped wash the dishes, took his mother grocery shopping, watched television, and spent some time on the computer.  (R. at 325-27.)

Plaintiff's mother testified that Plaintiff had pain and limitations due to his leg impairment, and that things were getting harder for Plaintiff to do.  (R. at 334-37.)  Plaintiff's brother,

testified that Plaintiff's leg was getting worse, and that he could not do a vending job at the company the brother worked for because it would involve hauling heavy loads up steps. (R. at 338-39.) Plaintiff's friend, Alma Taetter, testified that she saw Plaintiff about once a month, and that Plaintiff had "a very tough time walking and especially if the weather gets really bad." (R. at 341.)

    The hypothetical question posed to the VE, directed him to assume an individual with Plaintiff's vocational characteristics who could perform medium work with no climbing of ladders, ropes, or scaffolds, or of anything over five feet, with occasional performance of other postural functions. The ALJ further directed the VE to assume the individual could not stand more than five hours out of the work day and could only work inside. (R. at 344.) The VE testified that the hypothetical individual could not perform Plaintiff's past work as a material handler because it was classified as heavy work, but could perform his past work as a photo technician and tank operator, as well as thousands of other jobs. (R. at 344-47.) When the ALJ added that the hypothetical individual needed to have a sit/stand option, could not perform postural functions more than 10 percent of the time, and needed to avoid environmental hazards such as unprotected heights and dangerous machinery, the VE testified that these restrictions would preclude performance of any of Plaintiff's past relevant work. (R. at 345.) However, the individual could still perform thousands of sedentary jobs. (R. at 347.) The VE further testified that adding a limitation to only frequent handling, fingering, and feeling with

7

the non-dominant upper extremity would eliminate the cashier jobs previously identified by the VE, but that the individual's ability to perform the other sedentary jobs the VE had identified would be preserved. (R. at 347-48.)

In its January 5, 2005 written decision, the ALJ found that Plaintiff suffered from "status-post right hip to right leg fracture, status-post open reduction and internal fixation of that fracture and status-post brain tumor," which were severe impairments but not severe enough to meet or to medically equal a condition contained in the Medical Listings. The ALJ found Plaintiff's allegations regarding his limitations generally credible but not to the extent alleged. The ALJ found Plaintiff's allegations were inconsistent with the objective medical evidence, the absence of more aggressive treatment, and claimants ordinary activities. In particular, the ALJ noted that Plaintiff's limitations do not prevent him from routinely performing daily activities, including caring for his personal needs, mowing grass every three weeks with a push mower, driving a car, doing dishes, and grocery shopping. The ALJ also noted that Plaintiff was not taking pain medication at the time of the hearing although he had claimed to be in constant pain. The ALJ concluded that Plaintiff retained the residual functional capacity (RFC) to perform a limited range of light work with no climbing of ladders, ropes, or scaffolds; no significant (10 % or less) balancing, stooping, kneeling, crouching, or crawling; no significant reaching, handling, fingering, feeling with his non-dominant upper extremity; no exposure to hazards including unprotected heights and dangerous

moving machinery; the option to alternate between sitting and standing as needed in the performance of job duties, and that, based on the VE's testimony, Plaintiff was able to make a successful vocational adjustment to work that existed in significant numbers in the national economy. Accordingly, the ALJ found Plaintiff was not disabled. (R. at 19-25.)

## II.  Legal Standard

In order to be entitled to disability insurance benefits, a plaintiff must show that his or her inability to work is medical in nature and that he or she is totally disabled. See 20 C.F.R. § 404.1505. Economic conditions, personal factors, financial considerations, and attitudes of employers are irrelevant in determining whether a plaintiff is eligible for disability benefits. See 20 C.F.R. § 404.1566.

The establishment of disability under the Act is a two-step process. First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. See 42 U.S.C. § 1382c (a)(3)(A). Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment. See McNeil v. Califano, 614 F.2d 142, 143 (7th Cir. 1980). That factual determination is made by using a five-step test. See 20 C.F.R. §§ 404.1520.

The five-step test is examined by the ALJ, in order, as follows:  (1) is the plaintiff presently unemployed; (2) is the

plaintiff's impairment "severe" (20 C.F.R. § 404.1521,); (3) does the impairment meet or exceed one of the list of specified impairments (20 C.F.R. Pt. 404, Subpt. P, App. 1); (4) is the plaintiff unable to perform his or her former occupation; and (5) is the plaintiff unable to perform any other work within the national economy?

An affirmative answer at any step leads either to the next step of the test, or at steps 3 and 5, to a finding that the plaintiff is disabled. A negative answer at any point, other than at step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. See Garfield v. Schweiker, 732 F.2d 605, 607 n.2 (7th Cir. 1984).

The plaintiff has the burdens of production and persuasion on steps 1 through 4. However, once the plaintiff shows an inability to perform past work, the burden shifts to the Commissioner to show ability to engage in some other type of substantial gainful employment. See Tom v. Heckler, 779 F.2d 1250, 1253 (7th Cir. 1985); Halvorsen v. Heckler, 743 F.2d 1221, 1225 (7th Cir. 1984).

The Court's function on review is not to try the case *de novo* or to supplant the ALJ's finding with the Court's own assessment of the evidence. See Pugh v. Bowen, 870 F.2d 1271, 1274 (7th Cir. 1989). The Court must only determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied. See Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986). In determining whether the ALJ's findings are supported by substantial evidence, the Court must consider whether the record, as a whole, contains "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). Credibility determinations made by the ALJ will not be disturbed unless the finding is clearly erroneous. See Imani v. Heckler, 797 F.2d 508, 510 (7th Cir.), cert. denied, 479 U.S. 988 (1986).

**III. Analysis**

Plaintiff argues that the ALJ failed to include all of his limitations in the hypotheticals posed to the VE. In particular, Plaintiff argues restrictions concerning his ability to balance, stoop, bend or crawl; his need to wait for his legs to recirculate blood after standing from a sitting position; and his restrictions from pain were omitted. The Court disagrees. The ALJ included an explicit and very significant, limitation on Plaintiff's postural abilities[1] when it found Plaintiff able to do work that involves "no significant (10 % or less) balancing stooping, kneeling, crouching or crawling."

As for Plaintiff's contention that the ALJ did not included any restrictions about the necessity to wait for his legs to re-circulate blood after standing from a sitting position," the Court finds that the only record evidence to suggest that this phenomena would create work related limitations is Dr. Bailey's opinion that Plaintiff could "only sit short periods because he complains of his leg stiffening and the blood flow seems to take a period of time before he can try to walk again." (R. at 237.) However, the ALJ's

---

[1]The Social Security Regulations note that postural functions include "stooping, climbing, crawling, or crouching." 20 C.F.R. § 404.1569a(c)(1)(vi).

conclusions were based on the assumption that Plaintiff would need the ability to sit or stand at will, which would accommodate this alleged limitation.  Further, Plaintiff testified that he could stand five hours at a time and sit an hour and 45 minutes at a time.   (R. at 314, 322.)   Thus, the Court finds the ALJ's hypothetical question adequately accommodated Plaintiff's claimed need to wait after sitting for an extended period.

Finally, although the ALJ failed to include restrictions concerning Plaintiff's pain, the record shows that the ALJ did consider Plaintiff's subjective complaints of pain but found them not credible to the extent claimed.  The record shows that Plaintiff's treating physicians were well aware of his complaints of pain, but their recommendations regarding Plaintiff's functional limitations did not include any restrictions resulting specifically from pain. (R. at 237-238.)  Further, Plaintiff did not list any routine pain medications on his disability report (R. at 85), nor did he mention taking any during the administrative hearing. Accordingly, the Court finds the ALJ's decision to discredit the extent of Plaintiff's allegations of pain was not clearly erroneous.

In conclusion, the Court finds the ALJ's findings were supported by medical evidence and were largely consistent with Plaintiff's own testimony.  The uncontradicted testimony of the VE supports the ALJ's conclusion that Plaintiff could perform a significant number of jobs despite the limitations caused by his impairments.   Accordingly, the Court finds the ALJ's decision should be affirmed.

## IV. Conclusion

IT IS THEREFORE ORDERED that Plaintiff's Motion for Summary Judgment [Doc. # 13] is DENIED and Defendant's Motion for Summary Affirmance [Doc. # 16] is GRANTED.

CASE TERMINATED.

Entered this <u>19th</u> day of September, 2006.

s/ Joe B. McDade
Joe Billy McDade
United States District Judge
